[No. 4766-7-II. Division Two. May 24, 1982.]

THE STATE OF WASHINGTON, *Appellant,* v. WILLIAM B. LEWIS, *Respondent.*

*C. Danny Clem, Prosecuting Attorney,* and *Christian Casad, Deputy,* for appellant.

*Laurence Finegold* and *Harvey Chamberlin,* for respondent.

PETRIE, J.—The State of Washington, pursuant to RAP 2.2(b)(2), appeals a pretrial order suppressing incriminating portions of a tape–recorded conversation made by defendant, William B. Lewis, to several members of the prosecutor's staff. The suppression hearing court held that Mr. Lewis did not voluntarily and unequivocally waive his right to have his attorney present at the time the recording was made. We reverse and remand for trial.

Lewis was under investigation by the Kitsap County Prosecutor's office for possible violations of state securities laws. The investigation centered on Lewis' placement of an advertisement in a Bremerton newspaper in October 1978 offering shares in a limited partnership known as Kitsap

Investment Associates. On September 6, 1979, Neal Yapa-
chino, an investigator in the prosecutor's office, telephoned
Lewis and arranged an interview with Lewis on the follow-
ing day. Yapachino knew that the state securities adminis-
trator had previously sent a letter to Lewis advising that a
similar advertisement placed by Lewis in May constituted a
violation of RCW 21.20.160. The obvious purpose of the
interview was to ascertain Lewis' knowledge of the illegality
of the October advertisement.

On September 7, 1979, Lewis voluntarily went to Yapa-
chino's office for the interview. Lewis was not escorted to
the interview by law enforcement officers, was not under
arrest when he arrived, nor was he arrested during the
course of the interview. Likewise, Yapachino never
informed Lewis that he was a suspect or under investiga-
tion. The interview was also attended by two deputy prose-
cutors, William Broughton and Ronald A. Franz.
Yapachino first advised Lewis of his *Miranda* rights and
then asked for permission to tape–record the interview.

After the tape recorder was turned on, Yapachino read-
vised Lewis of his *Miranda* rights. Lewis acknowledged his
understanding of these rights and responded as indicated in
the margin.[1] Yapachino then asked several general ques-

---

[1]"This is Neal Yapachino and it is September 7, 1979, at 10:11 a.m. I'm in my
office with Ronald A. Franz and William H. Broughton with us is Mr. William
Lewis.

Q. Is it William B.?

A. Yes.

Q. William B. Lewis. Mr. Lewis are you aware that this conversation is being
tape recorded?

A. Yes. With my permission.

Q. It's with your permission?

A. Yes.

Q. Okay, thank you. Before we get started I'd like to go through your rights,
Miranda warnings and I'll read them to you step by step and I'd like to
confirm them, do you understand?

A. Yes.

Q. First of all, number 1, you have the right to remain silent. You understand
that?

A. That's right.

Q. Two, anything you say can and will be used against you in a court of law.

tions about Kitsap Investment Associates before Franz interrupted to seek a clarification of Lewis' "waiver" of rights and assertion of right to counsel. The following exchange then occurred:

> Franz: Let me interject something here, before you go forward since Mr. Lewis has indicated that he isn't sure whether or not he wants to waive his right to remain silent and right to the presence of an attorney, you might get some clarification on that.
>
> A. I believe gentlemen that *if this is going to get into something deep where you're attempting to get me to incriminate myself then I should have an attorney present.* If there is any questioning on that particular subject.
>
> Q. Okay. Like I said before anything you say, can and will be used against you and *I do intend to ask some "deep" questions so you "have the right not to answer those questions."*
>
> A. We may proceed.
>
> Q. Okay, I can proceed. You will . . . at this point I can ask some relevant questions to the issue and at this point in time you will allow me to proceed without an attorney?
>
> A. I will, *I will allow you to proceed at this point.* I

---

Do you understand that?
A. Yes.
Q. Three, *you have the right to talk to a lawyer and to have him present with you while you're being questioned. Do you understand . . .*
A. *We'll cross that bridge when we come to it.*
Q. Okay, but do you understand that?
A. I understand that.
Q. Okay. Four, if you cannot afford to hire a lawyer, one will be appointed to represent you while you're being questioned if you wish. Do you understand that?
A. I understand that.
Q. Number five, you can decide at any time to exercise these rights and not answer any questions. Do you understand that?
A. I understand that.
Q. *Keeping these rights in mind, would you like to waive these rights and talk?*
A. *No, I'm not going to waive any rights,* a a a [sic] *I'll just wait until I know what's happening."*

(Italics ours.)

> don't know how deep you're going to go or if I've done anything wrong, I certainly hope not. But if we get into something that is beyond my knowledge, well then I'll just have to . . .
>
> Q.     Terminate at that point?
> A.     *Terminate at that point.*

(Italics ours.)

The interview then continued until it was terminated by Lewis after he realized that several of his answers indicated that when he placed the advertisement in October he knew from the security administrator's letter that the advertisement violated state securities laws. Lewis was not detained further, and he freely left the prosecutor's office.

At the CrR 3.5 hearing, the trial court suppressed that portion of Lewis' statement after the "clarification" exchange above. Findings of fact and conclusions of law were entered finding that (1) proceedings had reached the accusatory stage; (2) Lewis was not aware of the investigation; (3) Lewis conditionally asserted his right to have an attorney present; (4) Lewis' assertion of rights was not honored by the investigator; (5) Lewis did not voluntarily and unequivocally waive his right to have an attorney present; and (6) the totality of the circumstances indicated the inadmissibility of the statement.

The initial inquiry is whether Lewis was in custody for *Miranda* purposes when he made the incriminating statement. In order to trigger the protections afforded by *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966), a suspect must be taken into custody or "otherwise deprived of his freedom of action in any significant way," and subjected to custodial interrogation. The State argues that, pursuant to the rule of *Oregon v. Mathiason,* 429 U.S. 492, 50 L. Ed. 2d 714, 97 S. Ct. 711 (1977), Lewis was *not* in custody and therefore *Miranda* warnings were not required. Under a strict application of *Oregon v. Mathiason, supra,* Lewis was not in physical custody because (1) he came to the interview voluntarily and of his own free will, (2) he was never placed

under arrest, and (3) he was free to terminate the interview and leave whenever he chose. The fact that Lewis was read his *Miranda* rights in the height of caution does not convert the interview into custodial interrogation.

Notwithstanding the fact that Lewis was not technically in custody, we do find that the interview was custodial interrogation subject to *Miranda* protections. Interrogation becomes "custodial" for *Miranda* purposes when the questioning officer already has probable cause to justify an arrest for the offense which is the subject of inquiry, regardless of whether the suspect is actually placed under physical arrest or not. *State v. Creach*, 77 Wn.2d 194, 461 P.2d 329 (1969); *State v. Hilliard*, 89 Wn.2d 430, 573 P.2d 22 (1977). Here there was probable cause to arrest Lewis for securities violations at the time he walked into Yapachino's office for the interview. Investigators knew that Lewis had violated securities laws by advertising in the newspaper, that he had been advised that he was in violation of the law; but that nevertheless he had readvertised. General investigation had ceased. We cannot sanction a subterfuge interview whose sole purpose was to obtain additional incriminating information to facilitate a conviction before formally arresting Lewis. To sanction such deceptive and manipulative police practices would be to allow a perversion of *Miranda*. The police cannot manipulate the invocation of *Miranda* rights by simply delaying the time of formal arrest. This does not mean that police are obliged to arrest a subject at the moment they have probable cause to make that arrest, even though arrest would normally follow. It does mean, however, that if police or government officials discuss with the accused the subject of the offense of which they have probable cause to effect the arrest, they must comply with *Miranda*. Here, Lewis was entitled to and, indeed, received the cloak of *Miranda* protection from the minute the interview with Yapachino commenced.

█ Upon holding that Lewis was subject to custodial interrogation, the next inquiry is whether Lewis effectively waived his right to counsel. The waiver of a right to counsel

must not only be voluntary, but constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege. *Edwards v. Arizona,* 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct 1880 (1981). The determination of whether Lewis made an effective waiver rests on the classification of his request for counsel as either clear or equivocal. The State asserts that at best Lewis' assertion of his right to counsel was equivocal and that the State had a right to clarify the request to ascertain if indeed Lewis wanted an attorney present. *See Nash v. Estelle,* 597 F.2d 513 (5th Cir. 1979).

The exchange between Lewis and Yapachino indicates that Lewis never did make clear his request to have counsel present. During the advisement of *Miranda* rights, when asked by Yapachino whether he understood his right to counsel, Lewis responded: "We'll cross that bridge when we come to it." Furthermore, when asked whether he wanted to waive his rights, Lewis responded: "No, I'm not going to waive any rights, a a a [*sic*] I'll just wait until I know what's happening." Yapachino then sought to clarify the situation by further explaining Lewis' rights to him:

> Yapachino: Okay, why don't we do it this way. I'll get into the problem, I'll explain the problem with you and, you know, what we're looking at, what the situation is and at that point in time, if you decide to talk and give a statement to us you can, I guess waive your rights if you decide about some of the problems, if at any time you decide you do not wish to talk any further, you can terminate the meeting. Because, like I said, you've got the right to have an attorney present.
>
> Lewis: Surely.

Then Yapachino briefly explained, without asking any questions, that the investigators were interested in the limited partnership that had been advertised in the newspaper. Lewis began to talk about the advertisement, and a couple of questions on that subject followed until Franz interrupted and sought to clarify whether Lewis wanted an

attorney present for the interview. Lewis responded:

I believe gentlemen that if this is going to get into something deep where you're attempting to get me to incriminate myself then I should have an attorney present. If there is any questioning on that particular subject.

Lewis' request for counsel, in view of the prior conversations about counsel, was equivocal. It did not indicate whether Lewis wanted an attorney present at that time or was only reserving his right to terminate the interview and request counsel when he felt the questioning dictated it. Faced with this equivocation, Franz stopped questioning Lewis about Kitsap Investment Associates and sought to clarify whether Lewis wanted to terminate the interview until counsel was present. Franz' line of questioning was limited to clarifying the request and not tricking Lewis into an unwitting waiver. Lewis then expressed his intention as to proceeding without an attorney by declaring: "I will allow you to proceed at this point."

■ The general rule remains that when a suspect invokes his right to counsel all questioning must stop, *Miranda v. Arizona, supra,* and the right to terminate questioning must be scrupulously honored, *State v. Pierce,* 94 Wn.2d 345, 618 P.2d 62 (1980). *Miranda* does not impose a per se rule against a subsequent waiver of the right to counsel as long as the initial request was scrupulously honored, *State v. Pierce, supra,* and the defendant himself initiates further communication with law enforcement officers. *Edwards v. Arizona, supra.* A suspect is not trapped within his initial assertion of *Miranda* rights, but may choose to waive them. *Brewer v. Williams,* 430 U.S. 387, 51 L. Ed. 2d 424, 97 S. Ct. 1232 (1977).

The principle that all questioning must stop rests on a clear assertion of rights; a narrow exception exists when the assertion of the right to counsel is equivocal. When a suspect who has been informed of his rights expresses both a desire for counsel and a desire to continue the interview without counsel, it is permissible for the questioning official to make further inquiry to clarify the suspect's wishes.

*Nash v. Estelle, supra. Giacomazzi v. State,* 633 P.2d 218 (Alaska 1981); *State v. Smith,* 588 S.W.2d 27 (Mo. Ct. App. 1979); *State v. Clawson,* 270 S.E.2d 659 (W. Va. 1980). But any questioning after the equivocal assertion of the right to counsel must be strictly limited to clarifying the request. *Thompson v. Wainwright,* 601 F.2d 768 (5th Cir. 1979); *State v. Ladd,* 431 A.2d 60 (Me. 1981).

> [W]henever even an equivocal request for an attorney is made by a suspect during custodial interrogation, the scope of that interrogation is immediately narrowed to one subject and one only. *Further questioning thereafter must be limited to clarifying that request* until it *is* clarified.

*Thompson v. Wainwright,* 601 F.2d at 771. Furthermore, an interrogating officer may not utilize the guise of clarification as a subterfuge for eliciting a waiver of the previously invoked right, *Nash v. Estelle,* 597 F.2d at 517–18; *State v. Cody,* 293 N.W.2d 440, 446 (S.D. 1980).

This narrowly drawn exception to the general rule prohibiting further questioning must be jealously applied. The situation before us falls under the exception as outlined. Lewis' request for counsel was undoubtedly equivocal. Here, Franz was faced with two choices: To immediately cut off questioning or to clarify the request. Franz' course in clarifying the request was proper; the questioning that followed was properly limited to the equivocal request for counsel and did not constitute a guise to trick Lewis into a waiver. We find that as a result of this exchange Lewis subsequently voluntarily and knowingly relinquished his right to counsel per *Edwards v. Arizona, supra,* and chose to continue with the interview. It is clear that Lewis knew he retained his right to request counsel and, indeed, Lewis later invoked that right by terminating the interview.

Our holding here does nothing to lessen the heavy burden that the State bears to show the voluntariness of a waiver. *State v. Braun,* 82 Wn.2d 157, 509 P.2d 742 (1973). The exception here is of limited application arising only when the person being interviewed makes equivocal state-

ments. It is wholly inappropriate if, before an unequivocal waiver occurs, the questions deviate at all from clarifying the request. The suppression order of the trial court is reversed.

REED, C.J., and PETRICH, J., concur.

Reconsideration denied June 22, 1982.

Review denied by Supreme Court November 10, 1982.